Fullwood v. Tarrant County 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-92-020-CV

     P. D. FULLWOOD, INDIVIDUALLY AND
     d/b/a P.D. FULLWOOD OPERATING COMPANY, ET AL.,
                                                                                              Appellants
     v.

     TARRANT COUNTY WATER CONTROL AND IMPROVEMENT
     DISTRICT NUMBER ONE AND POOL COMPANY,
                                                                                              Appellees
 

From the 13th District Court
Navarro County, Texas
Trial Court # 103-89
                                                                                                    

O P I N I O N
                                                                                                    

      On June 29, 1981, P. D. Fullwood executed a warranty deed conveying the surface estate on
a 316.3-acre tract of land in Navarro County to the Tarrant County Water Control and
Improvement District Number One. The surface estate was acquired by the Water District for its
use in the construction of the Richland-Chambers Reservoir. The lessees under a 1943 mineral
lease continued production of oil and gas from the severed mineral estate until September 1986,
when the Water District acquired by condemnation the leasehold interest of Exxon Corporation
and Olsan Brothers, Inc. The Water District held and operated the leasehold interest until it
completed plugging and abandoning the wells in April 1987. As a result, the leasehold interest
terminated and the mineral estate reverted to Fullwood. 
      To protect his interest in the mineral estate, Fullwood leased the minerals under the 316 acres
to La Pesca Productions, Inc. on July 29, 1988. La Pesca then entered into a Joint Development
Agreement with Haupt, Inc. on August 1, 1988. Fullwood, La Pesca, and Haupt allege, however,
that they were deprived of reasonable access to the mineral estate because Pool Company,
contracted by the Water District to plug the wells, wrongfully left non-drillable material in one
or more of the well bores. Furthermore, according to Fullwood, the Water District wrongfully
obtained a temporary restraining order against the re-entry operation, attempted to obtain
temporary injunctions against re-entry and against construction of a pipeline, and repeatedly filed
groundless complaints with the Railroad Commission of Texas. As a result, the mineral interest
owners were unable to completely implement their plan to reestablish production before the land
was inundated by the waters of the Reservoir in the Spring of 1989. Fullwood, La Pesca, and
Haupt filed suit to recover damages for the actions of the Water District and Pool Company in
operating, plugging, and abandoning the wells.
Breach of Express or Implied Covenants
      Fullwood alleged that the Water District, as the operator of the leasehold estate from
September 1986 to April 1987, breached express or implied covenants by failing to properly
develop and produce the minerals. The trial court granted the Water District's first motion for
summary judgment, determining as a matter of law that the Water District was not liable for any
alleged breach of express or implied covenants. In point six, Fullwood, La Pesca, and Haupt
contend that the court erred in granting the Water District's first motion for summary judgment.
      The Water District acknowledges that the lessee under an oil and gas lease owes three basic
implied covenants to the reasonably prudent operator: (1) to develop the premises; (2) to protect
the leasehold; and (3) to manage and administer the lease.


 Nevertheless, the Water District
argues, without any supporting authority, that it should not be held to the reasonably prudent
operator standard because "doing so would defeat the purpose for which the working interests
were acquired." We disagree.
      The summary judgment record indicates that the working interests were acquired, not only
to facilitate the construction of a reservoir, but in an attempt to avoid the necessity for
condemnation of the entire mineral estate. The minutes of the Board of Directors of the Water
District, dated March 5, 1986, indicate that the Water District was aware of the problems
associated with purchasing only the working interest. Nevertheless, the Water District chose to
condemn only the leasehold estate and assumed the role of operator from September 1986 to April
1987. Any drainage from the field resulting from the breach of express or implied covenants
would have diminished the value of the mineral estate remaining when the lease was abandoned
by the Water District. Because a taking would not occur until the Water District subsequently
interfered with the right of access to the mineral estate,


 Fullwood would be unable to recover,
in an inverse condemnation proceeding, for such a diminution occurring before the mineral estate
reverted to him. As a result, Fullwood would be damaged without recourse unless the Water
District was held to the reasonably prudent operator standard of care. Therefore, we hold that the
Water District's argument is without merit and sustain point of error six.
The "Borrowed-Servant" Doctrine
      Pool Company filed a motion for summary judgment, arguing that, because Pool's personnel
were the "borrowed servants" of the Water District, Pool was not liable for any negligence or
other wrongdoing associated with the presence of non-drillable material in a plugged well or the
filing of false reports with the Railroad Commission. The court granted Pool's motion for
summary judgment in its entirety. In points seven and eight, Fullwood, La Pesca, and Haupt
contend that the court erred in granting Pool's motion for summary judgment because the summary
judgment evidence created a fact issue as to whether Pool's employees were the borrowed servants
of the Water District.
      In connection with the plugging activities, the Water District entered into an Equipment Lease
with Pool. Under the terms of that agreement Pool leased equipment, provided personnel, and
agreed to the performance of certain work. The lease provided that the Water District "shall
furnish all supervisory personnel for the project as contemplated by this lease agreement, which
personnel shall have sole and complete authority for the direction and supervision of all work to
be performed." (Emphasis added).
      Fullwood argues, however, that Pool retained actual control of the manner, method, and detail
of the plugging operations and the completion of the reports filed with the Railroad Commission. 
In response to Pool's motion for summary judgment, Fullwood offered the following excerpt from
the deposition of Woody Frossard, the Environmental Manager of the Water District:
The technical supervision, actually from that standpoint, if I'm understanding your
question—We had written specs of how to plug the well that had been approved by the
Railroad Commission. That was our Technical Specs that we used to do it. Mr. Ray [the
Water District's field supervisor] was in charge of seeing that the wells were done
according to those guidelines. I don't want to say that he was out there making the
decisions on how to plug a well, if that's what you're getting at. He was our field
supervisor from that standpoint.

(Emphasis added). Frossard also testified that Pool's toolpushers occasionally supervised the
plugging of wells. The testimony of Danny Slate, Pool's crew chief in charge of the well in which
the non-drillable material was found, was also offered on the issue of supervision and control. 
Slate confirmed that he received instructions from both the Water District and Pool's toolpushers.
      A contract between two employers providing that one shall have the right of control over
certain employees is a factor to be considered, but it is not controlling.


 The Texas Supreme Court
has held that a contract will not prevent the existence of a master-servant relationship when the
contract is "a mere sham or cloak designed to conceal the true legal relationship between the
parties."


 According to the Supreme Court, when "the right of control prescribed or retained over
an employee is a controverted issue, it is a proper function for the fact-finder to consider what the
contract contemplated or whether it was even enforced."


 Because the summary judgment record
contains evidence of Pool's control over the employees, the court erred in granting Pool's motion
for summary judgment. As a result, we sustain points of error seven and eight.
Restriction of Access and Reasonable Accommodation
      The Water District filed its second motion for summary judgment arguing that, as a matter
of law, no taking resulted from inundation of the Reservoir because the 1981 deed expressly
subordinated the mineral estate's right of access to the Water District's right to impound water
upon the surface. The trial court granted the Water District's second motion for summary
judgment, except with regard to Fullwood's royalty interest. After a jury trial on the value of
Fullwood's royalty interest, the court awarded Fullwood $60,000 and entered a final judgment in
favor of the Water District and Pool Company on all other theories of recovery. In points one
through five, Fullwood, La Pesca, and Haupt contend that the court erred in granting the Water
District's second motion for summary judgment. They argue that the summary judgment evidence
raised fact issues as to the meaning of the subordination clause and as to whether the manner in
which the Water District constructed the Reservoir and inundated the surface resulted in a
restriction of access to the mineral estate or failed to reasonably accommodate the rights of the
mineral interest owners.
      The deed contained the following provision to reserve the mineral interest in Fullwood:
The Grantor herein reserves unto themselves, their heirs, successors and assigns, all
oil, gas and other fluid or gaseous minerals in and under the land herein described,
together with the right of ingress and egress for the purpose of exploring for, and
producing the same therefrom, subject and subordinate, however, to the right of Grantee
to construct, maintain and operate a reservoir for impounding fresh water. Grantor,
their heirs, successors and assigns, shall prevent contamination of said reservoir during
or resulting from the use and development of the said reserved mineral estate.

(Emphasis added). A reservation of the mineral estate gives the grantor the dominant estate
including the right to use as much of the premises and in such a manner, absent an express
limitation, as is reasonably necessary to extract the minerals.


 We hold that the subordination
clause contained in the 1981 deed was such an express limitation of the dominant estate. A similar
subordination clause in a condemnation petition and judgment was interpreted by the court in
Trinity River Authority v. Chain as "completely destroy[ing] the value of the oil and gas estate."


 
The issues of restriction of access and reasonable accommodation, however, were not before the
court in Chain.
      In this case, Fullwood alleged that the Water District promised and represented that it would
compensate the mineral owners for wells to be capped and that it would pay the initial cost of
raising or protecting those wells to remain in production. Unlike the court in Chain, we do not
find that the subordination clause "completely destroyed the value of the oil and gas estate."


 In
fact, the summary judgment evidence suggests that the parties to the 1981 deed contemplated
continued production after the Reservoir was inundated. In Getty Oil Company v. Jones,


 the
Supreme Court was faced with seemingly irreconcilable positions; the surface owner was unable
to operate his automatic irrigation sprinkler system because of obstacles in the form of the lessee's
existing pumping units. Likewise, Fullwood is unable to produce oil and gas under its reservation
of the mineral estate because of the manner in which the Water District constructed the Reservoir
and inundated the surface.
      Although Fullwood's right to produce the minerals was made subordinate to the Water
District's right "to construct, maintain and operate a reservoir," the clause does not evidence an
intent to convey the entire mineral estate to the Water District. Indeed, the subordination clause
itself contains a covenant by Fullwood to prevent the contamination of the Reservoir from the use
and development of his reserved mineral estate. Even though the rights of the dominant estate
were made subordinate to the rights of the servient estate, the owner of each estate must exercise
his rights with due regard for the rights of the other.


 As a result, any interference by the Water
District with Fullwood's limited right to produce the minerals, beyond that reasonably necessary
to inundate the Reservoir, constituted a taking by inverse condemnation.


 Because the summary
judgment evidence suggests that the Water District did not reasonably accommodate Fullwood's
development of the minerals, particularly in light of prior representations that it would do so, and
that the Water District's actions restricted even Fullwood's limited access to the mineral estate,
we sustain points of error one through five.
      We reverse the judgment and remand the cause for trial.
 
                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Justice Cummings, and
          Justice Vance
          (Chief Justice Thomas not participating)
Reversed and remanded
Opinion delivered and filed November 18, 1992
Do not publish



fenses. Only when the other extraneous offenses were admitted at punishment did the
jury learn that Byrd had possessed a sawed-off shotgun and that he had also been convicted of
aggravated assault, terroristic threats, and the unlawful carrying of a weapon.
          Based upon the previous discussion, we also conclude that the collateral implications of
extraneous offenses 1, 5, 6, 8, and 9 were wide-reaching and that the jury probably put a great
amount of emphasis on the evidence is assessing punishment. We note, however, that the State,
as in Hernandez, probably acted in good faith in trying to admit the extraneous offense evidence
and, therefore, the error is not likely to be repeated. 914 S.W.2d at 238. Byrd's second point is
sustained.
          We affirm the portion of the judgment relating to Byrd's guilt, but we reverse the portion
relating to punishment and remand for a new punishment hearing. Due to our disposition of
Byrd's second point, we need not consider his sixth.



                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Justice Cummings,
         Justice Vance, and
         Chief Justice McDonald (Retired)
Affirmed in part, reversed and remanded in part
Opinion delivered and filed September 18, 1996
Do not publish